## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**EARL K. LAWRENCE, JR.**                                    CIVIL ACTION

**VERSUS**                                                   No. 17-9775

**GREAT LAKES DREDGE & DOCK**                               SECTION I
**COMPANY, L.L.C. OF LOUISIANA ET AL.**

## <u>ORDER AND REASONS</u>

Before the Court is an untimely[1] motion *in limine*[2] filed by defendant, who asks the Court to exclude two of plaintiff's designated experts from testifying at trial. Plaintiff opposes[3] the motion.

### I.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[1] The Court's Scheduling Order provides that "[a]ll pretrial motions, including motions *in limine* regarding the admissibility of expert testimony, shall be filed and served in sufficient time to permit hearing thereon no later than Wednesday, May 16, 2018. R. Doc. No. 10, at 1 (emphasis removed). Thus, to have been considered timely, such motions would have had to be filed by Tuesday, May 1, 2018. However, defendant did not file the present motion until May 16, 2018.

[2] R. Doc. No. 19; *see also* R. Doc. No. 25 (defendant's reply).

[3] R. Doc. No. 24.

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Hicks*, 389 F.3d at 524; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (discussing witnesses whose expertise is based purely on experience).

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Id.* "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*; *see also Daubert*, 509 U.S. at 596.

*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires a trial court to conduct a preliminary

assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire*, 526 U.S. at 147.

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the technique's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'"). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Federal Rule of Evidence 402], but also in the sense that the expert's proposed opinion would assist the trier of fact

to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note).

The Court applies a preponderance of the evidence standard when performing its gatekeeping function under *Daubert*. *See Daubert*, 509 U.S. at 592 n.10. The Court is not bound by the rules of evidence—except for those with respect to privileges—when doing so. *See id.*

## II.

## A.

Defendant challenges the admissibility of the putative expert opinion testimony of two of plaintiff's designated experts: economist Shael N. Wolfson ("Wolfson") and life care planner Shelly N. Savant ("Savant"). Wolfson calculated, and is expected to offer testimony at trial as to, "the diminution of earning capacity and associated economic impairment sustained by" plaintiff as a result of the incident at the heart of this case.[4] For her part, Savant developed a life care plan for plaintiff and is expected to testify at trial as to that plan.

---

[4] R. Doc. No. 19-2, at 1.

At a status conference on May 23, 2018, the parties agreed that defendant's challenge to Savant's testimony is premature at the present time.[5]  Therefore, the Court dismisses defendant's challenge to such testimony without prejudice.

With respect to defendant's challenge to Wolfson's testimony, defendant argues that Wolfson relied on "inappropriate income figures" to calculate the value of plaintiff's lost wages claim.[6]  Pointing to the Fifth Circuit's opinion in *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. App'x 942 (5th Cir. 2012), defendant contends that, as a matter of law, plaintiff's lost wages claim must be calculated based on his gross earnings for the year of his injury—in this case, 2015.[7]  Because Wolfson did not use plaintiff's 2015 earnings as the foundation for his calculations, defendant asks the Court to exclude Wolfson from offering his calculations at trial.

Further, defendant argues that "Wolfson's proposed [lost wages] figures are little more than subjective belief and unsupported speculation," because "Wolfson utilized [p]laintiff's highest earnings over a period of four (4) years, even though [p]laintiff's earnings in the year of his injury had significantly decreased."[8]  Thus, according to defendant, Wolfson's "earnings base" calculation "lacks a factual basis."[9]

---

[5] R. Doc. No. 23, at 1.
[6] R. Doc. No. 19-1, at 1.
[7] *See id.* at 6-7.
[8] *Id.* at 7.
[9] *Id.*

Defendant also contends that "Wolfson's analysis of the subsistence allowance and lost fringe benefits is [ ] unsupported by the facts."[10] In particular, defendant takes issue with certain assumptions employed by Wolfson in this analysis.[11]

Unsurprisingly, plaintiff disagrees with defendant's positions, arguing that "[t]he assumptions made by [ ] Wolfson are supported by the facts and law."[12] He relies on the Fifth Circuit's opinion in *Mayne v. Omega Protein Inc.*, 370 Fed. App'x 510 (5th Cir. 2010) (per curiam), to support the proposition that Wolfson's use of plaintiff's 2013 income to arrive at plaintiff's earnings base for purposes of calculating the value of plaintiff's lost wages claim was permissible.[13]

Plaintiff also argues that, in any event, "[l]oss of earning capacity is not the same as lost wages," suggesting that limitations on the calculation of the latter do not apply to the former.[14] He then cites to, and discusses, cases applying Louisiana law to explain loss of earning capacity.[15]

Lastly, plaintiff contends that certain assumptions underlying Wolfson's subsistence and fringe benefits calculations "are reasonable and not simply

---

[10] *Id.*
[11] *See id.* at 7-8.
[12] R. Doc. No. 24, at 1.
[13] *Id.* at 9-11.
[14] Id. at 11.
[15] *See id.* at 11-14 nn. 33-45.

conjecture."[16]  He suggests that defendant's challenge to such assumptions are better left for cross-examination.[17]

## B.

After considering the parties' arguments and the relevant case law, the Court concludes that it will not permit Wolfson to testify as to a lost wage calculation based solely on plaintiff's 2013 earnings.

The Fifth Circuit opinion in *Culver v. Slater Boat Co.* ("*Culver II*"), 722 F.2d 114 (5th Cir. 1983) (en banc), governs the calculation of the value of lost wages claims under the Jones Act and general maritime law:

> The calculation of damages suffered . . . by a person whose personal injuries will result in extended future disability . . . involves four steps: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value.

*Culver II*, 722 F.2d at 117; *see Culver v. Slater Boat Co.*, 644 F.2d 460, 462 (5th Cir. 1981) (describing the case as a "maritime personal injury case," and noting that the plaintiffs asserted claims under the Jones Act and general maritime law), *overruled in part and aff'd in part by Culver I*, 688 F.2d 280 (5th Cir. 1982) (en banc).  "[T]hat calculation of the lost income stream begins with the *gross earnings* of the injured party *at the time of injury*."  *Culver II*, 722 F.2d at 117 (emphasis added); *see also Martinez*, 481 Fed. App'x at 950 (noting that *Culver II* instructed "that lost wages should be calculated based upon the plaintiff's gross earnings at the time of his

---

[16] *Id.* at 14.
[17] *See id.*

injury"); *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587-88 (5th Cir. 1988) ("*Culver II* requires the court to use the plaintiff's gross earnings at the time of the injury.").

In light of *Culver II*'s instruction to anchor the lost wages analysis to a plaintiff's "gross earnings . . . at the time of injury," the Fifth Circuit has affirmed a district court's calculation of the value of a plaintiff's lost wages based only on the most recent year of a plaintiff's earnings, even where substantial variations exist between that amount and the amount earned by the plaintiff in the immediately preceding years. *See Martinez*, 481 Fed. App'x at 949-550. However, the Fifth Circuit has also permitted district courts to calculate a plaintiff's "gross earnings" for lost wages purposes "by analyzing the earnings from past years when earnings data is inconsistent." *Mayne*, 370 Fed. App'x at 517; *see also In re Parker Drilling Offshore USA LLC*, 323 Fed. App'x 330, 335 (5th Cir. 2009) (per curiam) (same). In other words, the Fifth Circuit has permitted averaging a plaintiff's earnings over a period of years, at least in some cases, to arrive at the plaintiff's "gross earnings." *See, e.g.*, *id.*; *but see Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984) ("However, the loss of wages is not based on the wage-earner's average earnings but on his earnings at the time of injury, the moment at which he suffers damage.").

Notwithstanding any ambiguity that can be gleaned from a review of Fifth Circuit case law, in this case Wolfson did not average plaintiff's earnings over a number of years and then use that average as plaintiff's earnings base. Nor did Wolfson use plaintiff's 2015 earnings—his earnings from the year of his injury.

Rather, despite reviewing plaintiff's tax returns for 2012, 2013, 2014, and 2015, Wolfson *only* used plaintiff's 2013 earnings—coincidentally, the year among those four years in which plaintiff's earnings were highest—to determine plaintiff's earnings base, despite the fact that the incident that allegedly injured plaintiff occurred in December 2015.[18]  Such an approach is inconsistent with even a liberal interpretation of the phrase "gross earnings . . . at the time of injury."

Moreover, Wolfson's report notes that he was "asked to assume earnings consistent with 2013 actual earnings."[19]  In other words, Wolfson did not make an independent determination that plaintiff's 2013 earnings represented the most appropriate amount from which to determine plaintiff's earnings base. Significantly, neither Wolfson's report nor plaintiff's opposition to the present motion provide the Court with *any* explanation as to why the 2013 figure is a more reasonable starting point than, say, plaintiff's 2015 earnings, or an average across the four years.

The Court can certainly imagine situations in which Wolfson's use of plaintiff's 2013 earnings could be appropriate.  For example, if plaintiff's lower 2014 and 2015 earnings reflected family responsibilities that were temporary in nature— for example, caring for a new child or caring for an elderly parent—then one could argue that use of plaintiff's 2013 earnings to calculate plaintiff's earnings base will result in a more accurate calculation of plaintiff's true lost wages.  However, neither plaintiff nor his expert have suggested any facts that warrant plaintiff's approach.

---

[18] *See* R. Doc. No. 19-2, at 2.
[19] *Id.*

For these reasons, Wolfson may not testify as to a lost wage calculation based solely on plaintiff's 2013 earnings.[20]

## C.

The Court also has serious doubts as to the admissibility of Wolfson's calculations of the values of plaintiff's lost subsistence and fringe benefits. Key assumptions made by Wolfson in calculating these figures appear to lack any factual foundation. If so, then Wolfson's calculations are inadmissible. *See Moore v. Int'l Paint, L.L.C.*, 547 Fed. App'x 513, 515 (5th Cir. 2013) (per curiam) (noting that "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible" (quoting *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007))).

However, the Court will defer determination of whether Wolfson may testify as to his calculations of the values of plaintiff's lost subsistence and fringe benefits until trial, at which time the Court will be in a better position to evaluate the calculations' factual underpinnings. The Court advises plaintiff that Wolfson should not testify as to these calculations until first establishing such underpinnings to the satisfaction of the Court.

## III.

Accordingly,

---

[20] The Court notes that any alleged distinction between "lost wages" and "lost earning capacity" under Louisiana law—a focus of plaintiff's opposition—is not relevant to this case, which does not involve any state law claims. *See* R. Doc. No. 1 (complaint).

**IT IS ORDERED** that the motion is **GRANTED IN PART**, **DEFERRED IN PART**, and **DISMISSED WITHOUT PREJUDICE IN PART**, as set forth herein.

New Orleans, Louisiana, May 31, 2018.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**